UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------

PATRIZIO PASQUALE,

Plaintiff,

-against-

POLICE OFFICER NICHOLAS NELSON SHIELD NO.
15798; SERGEANT WILLIAM CHIEN, SHIELD NO.
02837; POLICE OFFICER ANDREW DEMICHAEL,
SHIELD NO. 12438; POLICE OFFICER RALPH
CILENTO, SHIELD NO.10840; POLICE OFFICER
MICHAEL OGGERI, SHIELD NO. 29115; POLICE
OFFICER NICHOLAS MORIN, SHIELD NO. 20911,

Defendants.

------------------------------------------------------------------------

Docket    No.    14CV7497
(JBW)(VMS)

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Dated: Brooklyn, NY
March 11, 2016

Attorneys for Plaintiff
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue 3rd Floor
Brooklyn, New York 11217
By: Leo Glickman, Esq.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES…………………………………………………………………….......ii

SUMMARY STATEMENT….………………………………………………………………….…...1

SUMMARY JUDGMENT STANDARD…………………………………………………………..…3

POINT I

    PLAINTIFF'S  RIGHT TO BE FREE FROM AN UNREASONABLE AND
    UNLAWFUL INCURSION INTO HIS HOME WAS VIOLATED WHEN
    DEFENDANT NELSO DEMANDED THAT THE DOOR BE OPEN AND
    ENTERED HIS HOME OVER PLAINTIFF'S PROTEST…………………….……  4

    A. Plaintiff had Fourth Amendment Right to be Free from an Unreasonable Search and
       Seizure inside of 1430 Bay Ridge Avenue. …………………….……......…....4

    B. Defendants Nelson and DeMichael Entered Plaintiff's House Without a Warrant,
       Without Exigent Circumstances, and Without Consent………..............................5

POINT II

    DEFENDANTS' INITIAL WARRANTLESS SEIZUREOF PLAINTIFF WAS
    WITHOUT PROBABLE CAUSE OR REASONABLE SUSPICION AND
    ILLEGAL………………………………………………………………………….…14

    A. Based on all the Documents Generated by this Arrest, the  Initial Seizure of
       Plaintiff Constituted a False Arrest ……………………………………….. …14

    B. Defendant Nelson's After the Fact New Testimony Claiming that Plaintiff's
       Alleged Behavior Towards the Victim Obstructed the Officers' Investigation
       Should be Disregarded by the Court……………………………..………………17

## TABLE OF AUTHORITIES

**Cases**

**Page**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 247, (1986)……………………………………………………………….…….3

D'Amico v. City of N.Y.,
132 F.3d 145, 149 (2d Cir.1998)………………………………………………………….….21

Craddock v. Little Flower Children & Family Servs. of New York,
2016 WL 755631, at 4 (E.D.N.Y. 2016) Citing FED. R. CIV. P. 56(a)…………………….…….3

Florida v. Jardines,
133 S. Ct. 1409, 1411 (2013)……………………………………………………………...….4

Georgia v. Randolph,
547 U.S. 103, 114 (2006)………………………………………………………….…….13

Harris v. O'Hare,
770 F.3d 224, 239  (2d Cir. 2014), as amended (Nov. 24, 2014),
cert. denied, 136 S. Ct. 792 (2016)………………………………………………...………..4

Hicks v. The City of New York,
2015 WL 5774575, at 8 (E.D.N.Y., 2015) report and recommendation adopted,
2015 WL 5774658 (E.D.N.Y., 2015). …………………………………………….…….…..9

Jeffreys v. City of New York,
426 F.3d 549 (2d Cir. 2005)…………………………………………………….…………21

Jeffreys v. Rossi,
275 F. Supp. 2d 463, 477 (S.D.N.Y. 2003) aff'd sub nom………………………………………21

Lee Loi Indus., Inc. v. Impact Brokerage Corp.,
473 F. Supp. 2d 566, 570 (S.D.N.Y. 2007)………………………………………………….21

Moore v. Andreno,
505 F.3d 203, 208 (2d Cir. 2007)…………………………………………………...………..5,9

People v. Case,
42 N.Y.2d 98, 101, (1977), 42 N.Y.2d at 100–01, 396 N.Y.S.2d 841, 365 N.E.2d 872………..12

People v. Castro,
29 Misc. 3d 1217(A), (Sup. Ct. Bronx Cty. 2010).........................................................13

People v. Holmes,
44 Misc. 3d 1212(A), 997 N.Y.S.2d 669 at 4 (Crim. Ct., NY Cty. 2014)..............................16

People v. Offen,
96 Misc.2d 147, 148 (Crim Ct. NY Cty. 1978).............................................................16

People v. Martin,
35 Misc. 3d 133(A), 951 N.Y.S.2d 88 (App. Term, 2nd Dep't 2012)...................................17

Rasmussen v. City of New York,
766 F. Supp. 2d 399 (E.D.N.Y. J. Cogan 2011)..............................................................9

Southerland v. Garcia,
2010 WL 5173711, at 6 (E.D.N.Y. 2010) aff'd, 483 F. App'x 606 (2d Cir. 2012)...................11

United States v. Lavan,
10 F. Supp. 2d 377, 383 (S.D.N.Y. 1998).................................................................6,9

United States v. Martin,
426 F.3d 83 (2d Cir. 2005)..................................................................................11

United States v. Race,
2015 WL 576171, at 15 (W.D.N.Y. 2015) report and recommendation adopted,
2015 WL 4678624 (W.D.N.Y. 2015)........................................................................5,6

United States v. Simmons,
661 F.3d 151, 156 (2d Cir. 2011)..........................................................................5,10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------

PATRIZIO PASQUALE,

                                        Plaintiff,

                    -against-

POLICE OFFICER NICHOLAS NELSON SHIELD NO.
15798; SERGEANT WILLIAM CHIEN, SHIELD NO.
02837; POLICE OFFICER ANDREW DEMICHAEL,
SHIELD NO. 12438; POLICE OFFICER RALPH
CILENTO, SHIELD NO.10840; POLICE OFFICER
MICHAEL OGGERI, SHIELD NO. 29115; POLICE
OFFICER NICHOLAS MORIN, SHIELD NO. 20911,

                                        Defendants.

------------------------------------------------------------------------

Docket     No.     14CV7497
(JBW)(VMS)

MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT

## **SUMMARY STATEMENT**

On the night of January 3, 2013, plaintiff was arrested inside of his two family

home at 1430 Bay Ridge Avenue. A 911 dispatcher requested that sector 62C respond to

a "34 family" at the second floor of the location, and further stated that it was unknown

whether weapons were involved. A "34 family" is a family related assault.

1430 Bay Ridge Avenue has separate first floor and second floor apartments, each

separated from the common area of the home by front doors. It is undisputed that

defendant Officer Nelson and DeMichael, who were assigned to patrol 62C that night,

responded to the call. It is further undisputed that once at the front door, they demanded

and ordered that plaintiff let them in. Plaintiff refused to let them in.

Concerned that they would break the door, another person inside the location

opened the door. Defendant Nelson and DeMichael walked inside the home, despite

plaintiff's continuing protest to not enter the home.  Once inside, defendant Nelson

determined that plaintiff should be arrested for Obstructing Governmental

Administration, claiming, in sum and substance, that plaintiff "prevented" them from

conducting an investigation of the 911 call.  As will be described below, the underlying

conduct claimed to support the charges leading to the initial decision to arrest is not

criminal.

Plaintiff brings this Motion for Partial Summary Judgment in support of his

claims that 1) the officers' entry into his house was an unreasonable and warrantless

invasion of his home, and 2) the initial warrantless seizure of the plaintiff was without

probable cause or reasonable suspicion that he committed any crime.

Defendant Officer Nelson claims that after they began to try to seize him, plaintiff

"swung on him".  Plaintiff emphatically denies that he did any such thing and further,

each third party witness present at the scene denies it. In fact, all non-police witnesses

testify that the police, in apparent anger, entered the home as soon as the door was

opened and went to argue with and arrest plaintiff for not opening the door in the first

place.   Nevertheless, given the dispute of fact, we do not move for summary judgment

for the seizure after the alleged swing at defendant nelson allegedly took place.  Nor,

given the same dispute of fact, do we move for summary judgment on his excessive force

claim.  We are confident, however, that given Defendant Nelson's self-contradictory

statements and the other officers' selective memory, we will be able to prove those

claims at trial.

On a final summary note, though nothing in the criminal case against plaintiff

(who is white) mentioned or noted that plaintiff had used the derogatory term "nigger"

2

against Defendant Officer Nelson (who is black), this inflammatory accusation has suddenly arose in this civil litigation. Officers DeMichael, Oggeri, and Cilento, who otherwise remember hardly anything about that night, do remember that plaintiff had used that derogatory term. And Sergeant Chien, who arrived on the scene later, hardly remembers anything that Officer Nelson told him except that Nelson told him that plaintiff used that word against him. Yet, Officer Nelson, who communicated with the District Attorney's office about the incident and explained to the ADA what plaintiff said to him that night failed to communicate that the plaintiff used such derogatory language against him. Moreover, each third party witness (and plaintiff) deposed in this action denies that plaintiff said any such thing. Though we believe *even if* plaintiff said such a thing it would not justify the police entry into his home and arrest, we expect that defendants will continue to make the allegation to inflame the court and jury and we want it to be clear on the record that plaintiff denies making such a statement and that, from the record, the claim is highly dubious.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Craddock v. Little Flower Children & Family Servs. of New York, 2016 WL 755631, at 4 (E.D.N.Y. 2016) *Citing* FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, (1986).

## POINT I

### PLAINTIFF'S RIGHT TO BE FREE FROM AN UNREASONABLE AND UNLAWFUL INCURSION INTO HIS HOME WAS VIOLATED WHEN DEFENDANT NELSON DEMANDED THAT THE DOOR BE OPENED AND ENTERED HIS HOME OVER PLAINTIFF'S PROTESTS

A. Plaintiff had a Fourth Amendment Right to be Free from an Unreasonable Search and Seizure inside of 1430 Bay Ridge Avenue

"At the Fourth Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Florida v. Jardines, 133 S. Ct. 1409, 1411 (2013). "The area 'immediately surrounding and associated with the home'—the curtilage—is 'part of the home itself for Fourth Amendment purposes.'" Id. "A police officer not armed with a warrant may approach a home in hopes of speaking to its occupants, because that is 'no more than any private citizen might do.' But the scope of a license is limited not only to a particular area but also to a specific purpose, and there is no customary invitation to enter the curtilage simply to conduct a search." Id. *Internal citations omitted.*

In 2008 … it was clearly established that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" Harris v. O'Hare, 770 F.3d 224, 239 (2d Cir. 2014), *as amended* (Nov. 24, 2014), *cert. denied*, 136 S. Ct. 792 (2016). Furthermore, in 2008 it was "clearly established that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage." Id. "The front porch is the classic exemplar of an area to which the activity of home life extends." Jardines at 1411.

Here, defendant Officers Nelson and DeMichael knocked on the front door of 1430 Bay Ridge Avenue. Glickman decl. ex. "A" 65:16-24. This clearly did not violate plaintiff's Fourth Amendment right, since that is "no more than any private citizen would do." Jardines at 1411. However, once they demanded to be let in, they exceeded what any private citizen would do and used their authority as police officers to coerce their way into the Fourth Amendment protected area of the home.

B. Defendants Nelson and DeMichael Entered Plaintiff's Home Without a Warrant, Without Exigent Circumstances, and Without Consent.

It is undisputed that the defendant police officers did not have a warrant to enter plaintiff's home. Rather, they were responding to a radio call involving an alleged incident at 1430 Bay Ridge Avenue.

1. There were no exigent circumstances to justify defendants' entry.

The core premise underlying the Fourth Amendment is that warrantless searches of a home are presumptively unreasonable. United States v. Simmons, 661 F.3d 151, 156 (2d Cir. 2011). "Warrantless searches are per se unreasonable subject only to a few specifically established and well-delineated exceptions." Moore v. Andreno, 505 F.3d 203, 208 (2d Cir. 2007). The government may overcome the presumption that a warrantless entry was justified when there are "exigent circumstances" to do so. "The exigency of a situation may insulate a warrantless search from constitutional attack if "law enforcement agents were confronted with an 'urgent need' to render aid or take action." To determine whether there was an urgent need to render aid, the courts will look to the totality of the circumstances the officers faced based on what the responding officers knew at the time of the entry. United States v. Race, 2015 WL 576171, at 15

(W.D.N.Y. 2015) report and recommendation adopted, 2015 WL 4678624 (W.D.N.Y. 2015).

There is no *per se* rule to determine exigency. "Indeed, the Supreme Court at least twice has rejected such *per se* approaches in favor of fact-specific, case-by-case inquiries as to exigency." United States v. Lavan, 10 F. Supp. 2d 377, 383 (S.D.N.Y. 1998). No *per se* rule exists authorizing an officer to make a warrantless entry into a premises whenever he or she responds to an incident that allegedly involves domestic violence. Race at 15.

The totality of the circumstances the defendants' faced in this case did not justify their entry into plaintiff's home. Defendant Nelson had one data point of information before entering the home; that they had been called to the location for a "34 F". NYPD radio codes mean that a family related assault had occurred in the past or was in progress. Glickman decl. ex. "B". They knew the alleged incident occurred on the second floor, and they knew that there was no information indicating any weapon was involved. Glickman decl. ex. "C". They knew the alleged victim was male. Glickman decl. ex. "A" 59:15-23. They did not know of any trouble occurring before at that location, despite being regular patrol officers for that precinct. Glickman decl. ex. "A" 52:15-18.

Nelson had no information about what was going on inside other than what he was told on the radio run prior to the door opening, other than the alleged victim was coming down to answer the door. Glickman decl. ex. "A" 68:14 – 69:4. There were no visible injuries on the alleged victim. Glickman decl. ex. "A" 69:19-25. DeMichael did not observe anything unusual going on inside the home prior to the door being opened. Glickman decl. ex. "D" 31:13 – 32:8.

6

The defendant officers' behavior also indicated that they did not believe they were responding to an urgent situation.  When Defendant Officer Oggeri arrived, he observed Nelson speaking to the plaintiff. Glickman decl. ex. "E" 20:19 – 22:8.  Nelson knew that plaintiff was not the alleged victim. Glickman decl. ex. "A" 65:16 – 67:17. The next action the four officers took was to go to arrest plaintiff, who allegedly "swung" on Officer Nelson from a number of feet away.  Glickman decl. ex. "E" 22:9-17. He was arrested on the first floor.  Glickman decl. ex. "A" 78:14-18 and 81:2 – 82:15.  While Officer Nelson was at the location, no officer went upstairs, where the alleged incident took place.[1]  Glickman decl. ex. "A" 127:13-15.  No officer went to the second floor apartment, even though, as Nelson pointed out one would want to go to the apartment "to check to make sure there's no broken glass, nobody else is injured…"  Glickman decl. ex. "A" 136:18 – 137:9. Mario Paolini, the alleged aggressor in the domestic incident, was asked whether the police attempted to assess what had occurred and identify the person who made the 911 call. He testified "No, they were just going after him (plaintiff)… they were just going into his apartment.  Glickman decl. ex. "J" 47:4-20.

Oggeri investigated the alleged domestic incident "later on in the evening". Glickman decl. ex. "E" 33:5 -- 34:6.  Defendant Oggeri took the Domestic Incident Report.  Glickman decl. ex. "F".  Though the alleged incident took place on the second floor, Oggeri did not conduct any search. Glickman decl. ex. "E" 36:24 --37:2.  He does not recall ever going to the second floor apartment. Glickman decl. ex. "E" 37:20-22. And again, Nelson testified that no officer went to the second floor while he was there.

---

[1] It is noteworthy that Officer Nelson described the incident as entirely happening on the first floor that no officer went to the second floor, and then, when shown that he alleged that he was "prevented" by plaintiff from going upstairs, he claimed that they could not make it up the stairs because plaintiff was irate. Nelson 135:17- 138:23. *Infra.*

7

Glickman decl. ex. "A" 127:13-15.  No one was arrested in connection with the domestic

incident.  Glickman decl. ex. "E" 40:12-14.  Only plaintiff was arrested.  Id.  Indeed, the

entire focus of the officers responding to the scene was to first arrest plaintiff, who they

perceived to be challenging their authority by not opening the door, rather than

addressing the radio run.

Finally, Officer Nelson first arrived at the scene at 11:18 p.m.  Glickman decl. ex.

"N".  Defendant Sergeant Chien, his supervisor, arrived at 11:30 p.m.  Glickman decl. ex.

"T" 34:24 – 35:3.  When Chien arrived, plaintiff was in handcuffs. Glickman decl. ex.

"T" 36:17-21.  Officers Nelson, DeMichael, Oggeri and Cilento were with plaintiff in his

first floor apartment.  Glickman decl. ex. "T" 36:22 – 37:11 and 39:2-9.  No other

officers were there.  Id.  Glickman decl. ex. "T" 37:12-13.  The first thing Sergeant Chien

did upon arriving was to ask each officer what happened and ask plaintiff if he needed

medical assistance.  Glickman decl. ex. "T" 39: 18 – 40:11.  At some point after that,

Chien told Oggeri and Cilento to investigate the domestic dispute.  Glickman decl. ex.

"T" 43:16-22.  Oggeri and Cilento "had yet to investigate" the dispute.  Glickman decl.

ex. "T" 43:23 – 44:2.  Plaintiff submits that the police officers did not perceive the radio

run to be an emergency and did not act as if it was an emergency because the objective

facts did not support the notion that it was an emergency.  Yet, defendants entered

plaintiff's home despite his protestations and refusals to let them in.

There are no facts to overcome the presumption that defendants' entry into

plaintiff's home was unreasonable.  If the court were to rule that the radio run alone were

enough, we respectfully submit that it would be promulgating something that this Circuit

and the Supreme Court have repeatedly rejected, a *per se* rule to determine exigent

circumstances. *See e.g.* Hicks v. The City of New York, 2015 WL 5774575, at 8 (E.D.N.Y., 2015) *report and recommendation adopted,* 2015 WL 5774658 (E.D.N.Y., 2015).

In  United States v. Lavan, 10 F. Supp. 2d 377, (S.D.N.Y. 1998), a man who had earlier robbed a bank at gunpoint was believed to be inside of an apartment. When the police knocked on the door, a woman inside refused to let them in.  The police were concerned that the woman could have been being held hostage inside.  Nevertheless, rather than forcibly entering the home, they staked out the apartment and periodically asked to be let in.  After six hours, the police finally forcibly entered, where they found the suspect who had robbed the bank.  The court held that the entry violated the Fourth Amendment, stating:

> Law enforcement personnel on the scene were entirely justified in regarding this as a serious and potentially hazardous situation from the moment they arrived. Nevertheless, the protection afforded by the Fourth Amendment's warrant requirement against official entry into private homes without prior approval by a neutral magistrate was among the significant goals of our forefathers' fight for independence more than 200 years ago. That bulwark of liberty may not be disregarded absent a persuasive showing that the situation precluded application for a warrant.

In Moore v. Andreno, 505 F.3d 203 (2d Cir. 2007), the court began its opinion admonishing the plaintiff that: "Courts have long acknowledged that a person has the right to establish a private sanctum in a shared home, a place to which he alone may admit or refuse to admit visitors. Yet, with the recurrence of domestic violence in our society, we are loath to assume that a man may readily threaten his girlfriend, take her belongings, lock her out of part of his house, and then invoke the Fourth Amendment to

9

shield his actions." Id. at 205.  Though the court ultimately ruled that the police officers

had qualified immunity based on the fact that they *arguably* were given consent to enter

the room, the court rejected the officers' position that exigent circumstances justified the

entry.  In the case, police entered a locked room inside the house.  The house was known

to be the suspect's room only.  The court ruled that even if the officers believed that the

suspect may have been in the house, it "would only have been justified in conducting a

protective sweep of those spaces "where [he] m[ight] [have] be[en] found." There is no

suggestion that anyone thought Moore might have concealed himself in the erstwhile

locked study." Id. at 213-14.

In United States v. Simmons, 661 F.3d 151 (2d Cir. 2011), the police received a

radio run that a person inside an apartment had a gun.  When they arrived, the suspect's

roommate answered the door and explained that the suspect had a gun and that he

displayed it to him in a dispute some time earlier.  The police entered the suspect's room,

removed the suspect from the room and conducted a search where the gun described was

found.  The court ruled "the circumstances facing the officers at the time they searched

the bedroom were not sufficiently exigent to fall within this narrow exception…"

The defendants' warrantless entry into plaintiff's home creates a presumption that

the entry was unreasonable.  The burden is on the officers to articulate facts overcoming

the presumption of unreasonableness.  As stated above, the police officers who arrived at

the scene of the radio run did not hear anything inside the home other than the discussion

between defendant Nelson and plaintiff.  They did not observe anything unusual other

than the interaction between Nelson and plaintiff.  They observed nothing criminal. They

had no information about any history of violence or criminal activity at the location.  The

10

only information they had was what was given on the radio.  The courts have repeatedly held, even while acknowledging the combustible nature of domestic violence incidents, a domestic violence allegation without more does not overcome the presumption of unreasonableness.  Therefore, we respectfully submit that defendants Nelson and DeMichael illegally entered plaintiff's home.

### 2. No one inside the home gave consent to the defendants to enter the home.

To ascertain whether consent is valid, courts examine the totality of all the circumstances' to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority. Southerland v. Garcia, 2010 WL 5173711, at 6 (E.D.N.Y. 2010) *aff'd*, 483 F. App'x 606 (2d Cir. 2012).

Plaintiff did not consent to defendants' entry into the home, nor did anyone else inside the home.  Rather, an occupant inside was coerced into opening the door and the police immediately entered.

Defendant Nelson testified that he told plaintiff "we're going to have to open up the door.  We have to get in there." Glickman decl. ex. "A" 68:2-6.  Further, Nelson stated that he said to plaintiff "sir, you're going to let me in here, in this house."  He admitted that he was "demanding to be let in."  Id.  According to the Complaint Room Screening sheet, Officer Nelson told the ADA on the case that he threatened to kick in the door.  Glickman decl. ex. "G".  The officers were in uniform.  Glickman decl. ex. "A" 52:19-20.  Nelson had his service weapon, mace, baton and handcuffs on him.  Glickman decl. ex. "A" 52:23 – 53:7.  So did DeMichael.  Glickman decl. ex. "D" 22:2-5.  Adam

11

Vasquez, an occupant and third party witness in this case corroborated Nelson's testimony and further explained that Nelson was going to "force the door" and that the "door was going to come off". Glickman decl. ex. "H" 27:6-25.  Defendant Nelson alleged that Adam Vasquez opened the door.  Glickman decl. ex. "A" 70:7-10.  Another occupant, Bernardino Patrizio, stated that the police "pushed the door open and they came in". Glickman decl. ex."I" 18:23 – 19:7. Mario Paolini heard the police shouting to open the door. Glickman decl. ex. "J" 28:2-6.

As the door was opened, Nelson and DeMichael entered the home. Glickman decl. ex. "A" 70:7 – 22.  They remained inside the home when two other officers, defendants Cilento and Oggeri arrived.  Glickman decl. ex. "A" 74:20 -25.  Oggeri and Cilento walked right into the home as well.  Glickman decl. ex. "A" 75:2-4.  Clearly, in police uniforms, fully weaponized, and demanding to be let in the house, there was no consent, but rather a mere acquiescence to the show of authority.

3. Assuming *arguendo* that an occupant other than plaintiff gave consent to enter the home, plaintiff's rejection of such consent made defendants' entry unconstitutional.

There is no dispute that plaintiff refused to open the door for the defendants and demanded that they not enter the home.  Defendant Nelson testified that plaintiff said to him, "No, I'm not opening the door for you, I don't let cops in my house." Glickman decl. ex. "A" 66:14-16.  Defendant Nelson further claimed that plaintiff was telling him that he's not letting him in, (Glickman decl. ex. "A" 66:23-25) and further claims he said "I don't let cops in my house and I don't let niggers in my house" Glickman decl. ex. "A" 67:8-11.  (As described in the preliminary statement, plaintiff denies that he used the derogatory word towards any officer.)  Nelson also testified that as he's talking to Adam

12

Vazquez inside the house, plaintiff screams "Why you let the cops in the house, why you let this nigger in my home? I don't want this S-H-I-T." Glickman decl. ex. "A" 74:2-5. "No he didn't let us into the door to begin with, so that's a little inaccurate.  Because it makes it seem like he just opened the door for us and it was okay." Glickman decl. ex. "A" 130:25 – 131:4. DeMichael testified that plaintiff said "we don't want you here." Glickman decl. ex. "D" 34:9-13.

The Supreme Court has made very clear that if a tenant consents to police entry into a home, and another tenant objects, it is as if no consent was given at all.  Georgia v. Randolph, 547 U.S. 103, 114 (2006).  "Disputed permission is no match for this central value of the Fourth Amendment" Id. at 115.  Defendant Nelson made it very clear that, in his view, plaintiff did not want the police to come into his home. Plaintiff agrees with Nelson's characterization, he indeed did not want the police in his home.

There was a very simple solution to Nelson and DeMichael' s supposed problem, to ask the complaining victim to step outside to speak once he opened the door.  They made another choice however; to address their anger at plaintiff for not opening the door by rushing into the home, arguing with him, and then arresting and assaulting him. Plaintiff's refusal of consent renders the defendants' entry, even if another occupant consented (which we deny), a violation of the Fourth Amendment.

13

## POINT II

### DEFENDANTS' INITIAL WARRANTLESS SEIZURE OF PLAINTIFF WAS WITHOUT PROBABLE CAUSE OR REASONABLE SUSPICION AND ILLEGAL

A. Based on all the Documents Generated by this Arrest, the Initial Seizure of Plaintiff Constituted a False Arrest

In the NYPD Omniform Arrest and Complaint reports, defendant Officer Nelson charged plaintiff with Obstructing Governmental Administration ("OGA"), Disorderly Conducting for Fighting/Violent behavior, and Resisting Arrest.  Every document related to plaintiff's arrest is focused on the interaction between plaintiff and the officers.  None ever mentions, as Officer Nelson testified in his deposition, that he was obstructing governmental administration by yelling at the complainant.  The new story told by Officer Nelson at the deposition is plainly an after the fact attempt to justify his misconduct by seizing him for a false charge of OGA .

Defendant Nelson drafted the NYPD omniform arrest (Glickman decl. ex. "K") and complaint reports (Glickman decl. ex. "L").  Glickman decl. ex. "A" 135:3-4 (arrest report) and 139:14-21 (complaint report).    Each narrative says that at the time and place of occurrence "while responding to a male being assaulted above location deft was irate not letting police officers upstairs preventing officers from conducting an investigation." The arrest report was faxed to the District Attorney's office.  Glickman decl. ex. "A" 135:5-7.

The District Attorney's office drafted the criminal complaint.  Defendant Nelson signed the criminal complaint under a statement advising him that false statements are a class A misdemeanor.  Glickman decl. ex. "M".  The complaint states in relevant part:

14

> Deponent (Nelson) states that, at the above time and place,
> the deponent responded to a radio run for domestic assault
> and defendant came to the door and repeatedly refused to
> comply with deponent's numerous orders to open the door
> to the above mentioned location, preventing deponent from
> conducting deponent's investigation for said radio run.

The next paragraph goes on to say that plaintiff's brother-in-law (Adam Vasquez) opened

the door and that plaintiff "continued to shout at deponent (Nelson)." [Emphasis added.]

The criminal complaint then alleges that plaintiff said to Nelson "I'm going to fuck you

up" and that they began to tussle and then plaintiff, allegedly, "swung at plaintiffs face,

missing" him.

Defendant Nelson wrote in his memo book that at 11:18 pm they arrived at the

location and that "1 male confrontational with myself." [Emphasis added.]  The next

entry is at 11:54 pm and says "1 under from location, Pasquale, Patrizio." Glickman decl.

ex. "N".

The arrest of plaintiff caused a "49 report" to be generated.  Glickman decl. ex.

"O".  Defendant Nelson explained that a 49 report is a "detailed report of the incident on

January 3, 2013." Glickman decl. ex. "A" 130:3-12.  The 49 report explains that plaintiff

yelled at the officers and lunged at the officers, "preventing them from responding to the

radio run".  Glickman decl. ex. "O". Again, there is no mention that there was any

interaction between plaintiff and the complaining victim or any other civilian inside the

home.  (It is noteworthy that Nelson pointed out inaccuracies in the document, stating

that plaintiff "did not let us into the door to begin with… because it makes it seem like he

just opened the door for us and it was ok." He also stated that plaintiff "was very irate,

but he wasn't lunging at us in the beginning." Id.

15

Sergeant Lucido, a supervisor at the 62nd precinct, contacted the CCRB about the incident, and according to the complaint narrative, reported: "Patrizio Pasquale, for no apparent reason, lunged at the officers and a struggle ensued."  Glickman decl. ex. "P".

Furthermore, Nelson's supervisor, Sergeant Chien, who arrived at the scene later testified that "He was shouting only at the police officers."   Glickman decl. ex. "T" 64:11-26.

Though the narratives in the various reports shift and even contradict each other, the noteworthy fact (besides the changing story) that is consistent throughout is that there was no interaction between Defendants DeMichael and Nelson with the complaining victim or any other civilian prior to the arrest of plaintiff.  As the sworn criminal complaint states, Officer Nelson believed that plaintiff's non-compliance with his "numerous orders" to open the door is what prevented him from investigating the radio call and is the fact that underlies the OGA charge.  Plainly, refusing to open the door for the officers is not a crime.  The reason that dubious new facts were first alleged in defendant Officer Nelson's deposition testimony was to bolster the non-existent probable cause for the arrest.

"Ordinarily, a citizen's refusal to admit the police does not violate §195.05" (OGA). People v. Holmes, 44 Misc. 3d 1212(A), 997 N.Y.S.2d 669 at 4 (Crim. Ct., NY Cty. 2014).  The court cited approvingly to People v. Offen, 96 Misc.2d 147, 148 (Crim Ct. NY Cty. 1978), a case in which a shopkeeper "cursed at a police officer ... returned to his store, closed and locked the door and rebuffed police officers' numerous requests to

16

open it." Id. The court concluded that such conduct did not violate §195.05 because "it is no crime to refuse to open a door to police officers." Id.

In a Second Department case, the owner of a commercial building refused to open the door for the code enforcement officers or for the police. "The defendant subsequently arrived at the building and stood in the doorway while [Officer] Verwys continued, without success, to attempt to persuade the owner to open the door. After defendant failed to comply with Verwys' requests to move out of the doorway, defendant was arrested and charged with obstructing governmental administration in the second degree." The court ruled that "the owner had no legal obligation to open the door, and there were no exigent circumstances which would have allowed the police to forcibly enter the building without the owner's consent and without a warrant. Consequently, defendant's act of standing in the doorway did not obstruct, impair or prevent the administration of any law or other governmental function, and it did not prevent the police from performing an official function." People v. Martin, 35 Misc. 3d 133(A), 951 N.Y.S.2d 88 (App. Term, 2nd Dep't 2012).

As argued above, there was no warrant and no exigent circumstance justifying the defendants' entry into plaintiff's home. We therefore submit that arresting plaintiff for seizing plaintiff for "OGA" violated his right to be free from an unreasonable seizure.

B. Defendant Nelson's After the Fact New Testimony Claiming that Plaintiff's Alleged Behavior Towards the Victim Obstructed the Officers' Investigation Should be Disregarded by the Court.

As discussed above, neither Officer Nelson's nor NYPD's paperwork related to the arrest ever mentions that plaintiff was obstructing the investigation by screaming at the victim. The only facts from the paperwork supporting the Obstruction charge and his

17

initial seizure is plaintiff's refusal to open the door, which is not a crime.  Only in his

civil litigation deposition does the story emerge of plaintiff's verbal interference with

defendants' conversation with the complaining victim.  Plaintiff respectfully submits that

the court should disregard such contradictory, self-serving and implausible testimony.

　　　In his deposition, Defendant Nelson states that after demanding to be let in,

another person, the complaining victim, opened the door for him and Officer DeMichael.

Glickman decl. ex. "A" 69:14-15.  Nelson claims that he went inside the home and spoke

to the complaining victim.  Glickman decl. ex. "A" 70:7 – 71:12.  He claims that plaintiff

was screaming at the complaining victim.  Id. He claims that Officer DeMichael went to

speak with plaintiff, while he stayed behind continuing to speak with the complaining

victim.  Glickman decl. ex. "A" 73:13-21.  DeMichael went to speak with plaintiff in the

first floor hallway.  Glickman decl. ex. "A" 76:6-9. DeMichael was further inside the

home than Nelson. Glickman decl. ex. "A" 77:8-14.  After DeMichael went to speak with

plaintiff, Nelson claims that Officers Oggeri and Cilento arrived.  Glickman decl. ex. "A"

74:16-19. Nelson and DeMichael were inside when Oggeri and Cilento arrived.

Glickman decl. ex. "A" 74:20-25.   Oggeri was standing near the door in the hallway and

the steps. He and Cilento were standing parallel to one another.  Glickman decl. ex. "A"

76:21-77:7.  Then Nelson and DeMichael "flip flopped", Nelson walked further down the

first floor hallway, and DeMichael came back closer to the door to speak to the victim.

Glickman decl. ex. "A" 77:15 -- 79:2.  Cilento went down the first floor hallway with

Nelson.  Glickman decl. ex. "A" 79:2-9.  Nelson claims that he and Cilento asked him to

go inside his first floor apartment three times, which is within 5 feet from where they are

standing in the first floor hallway, but plaintiff refused.  Glickman decl. ex. "A" 79:18 –

18

81:7.  Next Nelson claims that plaintiff must have heard a trigger word, and plaintiff lost it verbally.  Glickman decl. ex. "A" 81:2-7.  At that point, Nelson says that he and Cilento attempted to put the plaintiff in handcuffs and, he claims, the altercation ensued and they "roll" into plaintiff's kitchen inside the first floor apartment.  Glickman decl. ex. "A" 81:8- 82:15.  Plaintiff was ultimately successfully handcuffed inside the kitchen in his apartment by Cilento and Nelson.  Glickman decl. ex. "A" 93:18 – 25.

To summarize, in the lengthy, detailed description from the time he approached the location to the time he placed plaintiff under arrest, Nelson indicates that the entire interaction happened on the first floor of the apartment.  Nelson was speaking to the complaining victim near the front door on the first floor, DeMichael went to speak to plaintiff closer to the door of the first floor apartment, they flip flop, DeMichael comes back closer to the front door and Nelson further in to speak with plaintiff.  And from there, the altercation ensues.

However, later in his deposition, he was shown his NYPD Omniform Arrest Report (Glickman decl. ex. "K"), which he faxed to the District Attorney's office.  His narrative was read back to him, which says: "defendant was irate not letting police officers upstairs, preventing officers from conducting investigation."  Glickman decl. ex. "A" 135:17 – 136:2.  He says that is has a little less details but is accurate.  Id. When asked how plaintiff was preventing him from going upstairs, he replies:  "… if Pasquale would have gone into his apartment like we asked him to, we probably would have gone upstairs to the victim's house, which is the upstairs apartment." Glickman decl. ex. "A" 136:3-17.  He further stated they were trying to go upstairs, that he wanted to check for broken glass and if there were injuries. Glickman decl. ex. "A" 136: 18 – 137:9. But

19

"they never made it upstairs to talk to the complainant." Glickman decl. ex. "A" 136:14 -
17.  Nelson said that plaintiff prevented them from going upstairs by "being irate and
yelling at the victim".  Glickman decl. ex. "A" 138:3-24.

Clearly, defendant Nelson is inventing new details to justify his statement in his
report.  Nelson's story morphed from his original narrative in his deposition that they
were trying to speak to the complaining victim and to plaintiff on the first floor to stating
that he and DeMichael were trying to go upstairs, but that plaintiff was preventing them
from doing so.

Finally, Nelson contradicted himself again in his deposition stating
(nonsensically) "[A]nd it says radio run to the second floor.  We didn't even make it
halfway up the steps before the victim was the one who answered the door."  Glickman
decl. ex. "A" 131:5-8.  He further stated that "we were on the steps, but we didn't go
anywhere because he was just screaming at the victim."  Glickman decl. ex. "A" 132:9 -
11.  Nelson said that when he began to talk to the victim (who answered the first floor
front door) he was on the steps, and DeMichael was "higher up the steps" in direct
contradiction to his earlier testimony that everything took place on the first floor until at
least plaintiff was arrested.

What is clear in his deposition, and the arrest documents, is that defendant Officer
Nelson is constantly fabricating details and facts to confront his immediate needs.  In
doing so, he contradicts himself throughout.  Defendant Officer DeMichael, his partner
that night, was asked if they went up the stairs.  He emphatically replied "No, no."
Glickman decl. ex. "D" 36:5-9.

20

"At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.1998).  The rationale underlying the rule that contradictory evidence may be disregarded is that a party cannot rely upon implausible testimony to create a triable issue of fact. Jeffreys v. Rossi, 275 F. Supp. 2d 463, 477 (S.D.N.Y. 2003) *aff'd sub nom.* Jeffreys v. City of New York, 426 F.3d 549 (2d Cir. 2005).  While the circumstances in disregarding evidence in a summary judgment motion are rare, "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" the court may disregard it and grant summary judgment. Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).  "It is well-settled in Second Circuit that self-serving and contradictory affidavits cannot defeat motion for summary judgment." Lee Loi Indus., Inc. v. Impact Brokerage Corp., 473 F. Supp. 2d 566, 570 (S.D.N.Y. 2007).

Here, the operative document, the charging document sworn to under a misdemeanor penalty by defendant Nelson, is the Criminal Complaint.  As noted earlier, the Criminal Complaint states that the underlying conduct by plaintiff to support the Obstructing Governmental Administration charge is that he refused to comply with Nelson's order to open the door – something as explained above he did not have to do. To defeat this portion of the summary judgment motion, the court would have to credit the fanciful and contradictory deposition testimony offered by defendant Nelson, since all the other evidence – reports created within one day of the arrest -- favors summary judgment.  His testimony early in the deposition contradicted the arrest records.  Then, when confronted with the arrest records, he contradicted his earlier deposition testimony

21

to fit the sworn and unsworn arrest reports.  We respectfully submit that this is the "rare circumstance" discussed by the Second Circuit in <u>Jeffreys</u> in which should disregard testimony that the nonmoving party must rely on exclusively to defeat summary judgment.

For all the foregoing reasons, plaintiff respectfully submit that summary judgment must be granted against Defendants Nelson and DeMichael for entering plaintiff's home without a warrant, exigent circumstances or consent.  Plaintiff further submits that summary judgment must be granted against Defendants Nelson and DeMichael for seizing him because he refused to admit them into his home.

DATED:     Brooklyn, New York
           March 16, 2016

**Stoll, Glickman & Bellina, LLP**
Attorneys for Plaintiff
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY  11217
(718) 852-3710
lglickman@stollglickman.com

BY: _____
     Leo Glickman (LG3644)

22