UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PASQUALE PATRIZIO,

                    Plaintiff,

          – against –

POLICE OFFICER NICHOLAS NELSON,
SERGEANT WILLIAM CHIEN, POLICE
OFFICER ANDREW DeMICHAEL, POLICE
OFFICER RALPH CILENTO, POLICE
OFFICER MICHAEL OGGERI, and POLICE
OFFICER NICHOLAS MORIN,

                    Defendants.

**MEMORANDUM AND ORDER**

14-CV-7497 (JBW) (VMS)



JACK B. WEINSTEIN, Senior United States District Judge:

**Table of Contents**

I.    **Introduction** ..................................................................................................................2

II.   **Facts** ...............................................................................................................................3

III.  **Law** ................................................................................................................................10

   A.   **Summary Judgment** ...............................................................................................10

   B.   **Section 1983** ............................................................................................................11

   C.   **Unlawful Entry** ......................................................................................................12

      1.   **Reasonable Expectation of Privacy** .................................................................12

         i.   **Common Area** .............................................................................................13

         ii.  **Kitchen** .......................................................................................................14

      2.   **Exigent Circumstances** ...................................................................................15

      3.   **Consent** ...........................................................................................................16

   D.   **False Arrest** ............................................................................................................18

      1.   **Obstructing Governmental Administration** ...................................................19

      2.   **Disorderly Conduct** ........................................................................................20

   E.   **Qualified Immunity** ...............................................................................................20

III.   **Application of Law to Facts** ................................................................................... 21

   A.   **Unlawful Entry** ........................................................................................................ 21

   B.   **False Arrest** ............................................................................................................... 23

IV.   **Conclusion** ........................................................................................................................ 25

## I.    Introduction

Plaintiff, Pasquale Patrizio, filed a third amended complaint against six police officers in their official and individual capacities.  (The original caption reverses plaintiff's first and last names; all papers filed in the future shall show the corrected caption.)  It is undisputed that defendants arrived at Patrizio's building after receiving a 911 call about a domestic assault in progress.  Plaintiff contends that the officers unlawfully entered his home and falsely arrested him using excessive force.  The officers' position is that they only entered a common area of the building to which plaintiff's Fourth Amendment rights did not extend; that the arrest was based on probable cause; and that excessive force was not used.  The parties filed cross motions for summary judgment on the unlawful entry and false arrest claims; the excessive force claim is not subject to a motion.

Oral argument was heard on May 25, 2016 and June 9, 2016.  *See* Hr'g Tr., May, 25, 2016, ECF No. 78; Hr'g Tr., June 9, 2016.  Plaintiff and defendant police officers (aside from Officer Nicholas Morin, who was absent on consent) were physically present, sworn, and gave testimony.

Plaintiff's motion is wholly denied.  Defendants' motion on the false entry claim is granted, but only with respect to the officers' entry into the common hallway.  Defendant William Chien is dismissed on qualified immunity grounds.  Officer Morin, Chien's driver, is dismissed on consent.  *See* Pl.'s Reply, ECF No. 72, at 10.

A jury will be selected by the magistrate judge on July 11, 2016.  On or before that date, the parties shall submit to the court in limine motions, supporting briefs, and proposed jury charges and verdict sheets.  They shall exchange and file with the court by July 20, 2016: (1) lists of pre-marked exhibits proposed for use at trial, with copies of exhibits and stipulations regarding admissibility and authenticity; (2) lists of proposed witnesses with brief summaries of their proposed testimony; and (3) stipulations as to undisputed facts.  Motions in limine will be heard at 11:30 AM that morning.  Trial will begin at 12:30 PM.

## II.    Facts

Much of the details of what happened at critical points in the interaction between plaintiff and defendants is unclear.  In the main, however, the scenario is sufficiently established to permit rulings on the motions before the court.

The following facts appear to be undisputed; they are assumed for the purposes of the present motions.  *See generally*, Pl.'s Rule 56.1 Statement, ECF No. 55; Defs.' Resp. to Pl.'s Rule 56.1 Statement, ECF No. 65; Defs.' Rule 56.1 Statement, ECF No. 69; Pl.'s Resp. to Defs.' Rule 56.1 Statement, ECF No. 71; Hr'g Tr., May, 25, 2016; Hr'g Tr., June 9, 2016.

Plaintiff resides with his father, Bernadino Patrizio, in the first-floor apartment of a two-unit apartment building at 1430 Bay Ridge Avenue in Brooklyn.  His sister, Ana Vasquez, lives in the second-floor apartment with her husband, Adam Vasquez, and her son from a previous marriage, Mario Paolini.  (For the purposes of clarity, this memorandum refers to Patrizio's family members by their first names.)

On the evening of January 3, 2013, Adam and Mario were involved in a dispute inside their apartment about Mario's failure to do his chores.  Adam may have put Mario in a headlock, and Mario allegedly punched Adam in the face.  Adam called 911 and asked for police

assistance.  In a radio call to police officers in the area, the 911 dispatcher described the issue as a "34 family," which is a family-related assault in progress.  The dispatcher also stated, "weapons unknown."

Defendants Nicholas Nelson and Andrew DeMichael were patrolling the area in uniform and responded to the call.  They turned on their police car lights and drove through at least one stop sign to arrive as soon as possible.

After the 911 call, but before the police arrived, Adam told Patrizio and Ana that he had called the police.  Mario believed Patrizio was frustrated that Adam called the police, and Bernadino observed Patrizio become visibly upset.

The building has outer steps that lead to a porch door.  Inside the porch door is a vestibule leading to an inner door.  The inner door opens to a common hallway.  The common hallway leads to the first-floor apartment door as well as a stairway to the second floor.  The following is a depiction of the first-floor layout, approximately to scale:



Ground Floor

COURT'S
EXHIBIT NO. 1
IDENTIFICATION/EVIDENCE
DKT.# 14 cv 7497
DATE: 6/9/2016

HALL

KITCHEN
90.48 sq ft
15' 4 5/8" × 5' 11 1/2"

DINING ROOM
148.76 sq ft
10' 2 1/2" × 14' 7 1/2"

Door to first-floor apartment

HALL

D

Stairs to the second floor

C

VESTIBULE

B

A

0'    4'    8'    12'
1:77

 

Upon arrival, Officers Nelson and DeMichael opened the unlocked porch door (A), walked into the vestibule (B), and knocked on the inner door (C). They also rang doorbells for both the first- and second-floor apartments. Patrizio was in his first-floor apartment. He approached the inner door (C) from the common hallway (D). He could see and hear the officers through a glass window in the door (C). He repeatedly told the officers that he would not open the door (C) and that they should ring the doorbell for the second-floor apartment to prompt someone upstairs to do so. Patrizio was aware that the officers were responding to Adam's 911

5

call. A resident of the upstairs apartment opened the door (C) so Nelson and DeMichael could enter the common hallway (D).

Although the precise timing is unclear, at some point after Nelson and DeMichael's reached the outer door (A), defendant police officers Michael Oggeri and Ralph Cilento arrived at the scene.

Patrizio was later arrested for Obstruction of Governmental Administration and Disorderly Conduct. Defendant Chien, the supervising sergeant, arrived after the arrest and approved it. An ambulance provided medical services to plaintiff before taking him to the hospital. Defendants state that Chien called for the ambulance; Patrizio is unaware of who made the call.

The sequence is vague, but apparently after Patrizio's arrest, Chien directed Oggeri and Cilento to investigate the domestic dispute. Oggeri filled out the domestic incident report regarding the dispute between Adam and Mario. Adam refused to give a written statement, and Mario was not arrested.

The following facts are in contention.

Defendants claim that once Nelson and DeMichael arrived at the inner door (C), they identified themselves as police officers and informed plaintiff that they needed further access to investigate a reported assault. Glickman Decl., Ex. A ("Nelson Dep. Tr."), ECF No. 57-1, at 65:16-67:9. The officers stated that plaintiff refused to open the door and was combative from the start. *Id.*, Ex. D ("DeMichael Dep. Tr."), ECF No. 57-4, at 32:15-18. Patrizio allegedly told Nelson, "I don't let cops in my house, and I don't let niggers in my home." Nelson Dep. Tr. at 67:8-11; *see also* DeMichael Dep. Tr. at 34:15-16 (testifying that Patrizio said "fuck you, nigger" to Nelson). (Patrizio is White; Nelson is African American.) Nelson testified that

plaintiff's actions seemed suspicious to him because the 911 call reported an assault in progress. Nelson Dep. Tr. at 66:17-20.

According to Patrizio, he did not want to answer the door because the 911 call did not concern him. Glickman Decl., Ex. Q ("Patrizio Dep. Tr."), ECF No. 57-17, at 41:11-42:4. He also says he did not like the way Nelson was "demanding" that he open the door. *Id.* at 42:19-43:8, 59:9-12. He denies making any racial or derogatory statements to the police officers. Hr'g Tr., May, 25, 2016, at 18:3-9.

The District Attorney's Complaint Room screening sheet states that Nelson said he "told [Patrizio] that if [Patrizio] doesn't open the door, [Nelson] is going to have to kick the door down." Glickman Decl., Ex. G ("DA Screening Sheet"), ECF No. 57-7. Plaintiff stated that Nelson "started hitting the door [(C)] with a shovel, like trying to break the door down, trying to break the door in." Patrizio Dep. Tr. at 47:10-12. He alleges that at that point, Ana, the upstairs tenant, buzzed in the officers from upstairs so that the door (C) would not break. *Id.* at 46:23-25; *see also* Johnson Decl., Ex. C ("Ana Dep. Tr."), ECF No. 64-3, at 33:7-12 ("I buzzed them in because they were banging and banging and banging, open the door. I said, oh, before this door breaks and causes more problems, I'll buzz him in and, you know, see what he has to say; you know, see what's what."); Glickman Decl., Ex. H ("Adam Dep. Tr."), ECF No. 57-8, at 27:16-17, 22 ("Anna took it upon herself to ring the buzzer . . . The door was going to come off, so to speak."). Moments before that, Patrizio's father got up to open the door, but Patrizio told him not to open it. Patrizio Dep. Tr. at 48:12-20.

The officers believe that the complaining witness for the domestic assault, Adam, who had arrived downstairs, opened the door for them. Nelson Dep. Tr. at 67:12-23; DeMichael Dep.

Tr. at 36:10-19. They deny plaintiff's contention of a threat to kick down the door. Nelson Dep. Tr. at 67:24-68:9; DeMichael Dep. Tr. at 39:23-41:11.

Plaintiff contends that as soon as Ana allowed the officers to enter, Nelson ran towards him and pushed him to the floor. Patrizio Dep. Tr. at 47:17-24. This push is claimed to have occurred in the common hallway (D). *See* Hr'g Tr., June 9, 2016. Plaintiff states Nelson went up the stairs, and Patrizio went into his apartment and was standing in the kitchen. Patrizio Dep. Tr. at 49:21-50:3.

Plaintiff alleges that the officers then came down the stairs and opened Patrizio's unlocked apartment door to enter his kitchen. *Id.* at 50:3-21. Plaintiff testified that Nelson yelled, "When I tell you to open the door, open the door," and stomped his feet in a "belligerent" manner. *Id.* at 50:22-51:12. Patrizio says he said, "Listen, I'm done with this. I'm going to sleep," and turned his back. *Id.* at 51:18-52:11. He testified that all of the officers present then "jumped on [him]" while he was in his kitchen. *Id.* at 52:7-8, 53:2-5. He claims that they entered into his kitchen without his consent. Hr'g Tr., May 25, 2016, at 20:6-21:3. Plaintiff stated, "One got me by the neck, two got me by each arm and two got me by each leg, and they slammed me face first into the [kitchen floor]." Patrizio Dep. Tr. at 53:6-11. Patrizio's testimony is that Nelson repeatedly said to Ana, "You seen him lunge at us." *Id.* at 52:9-11, 53:23-54:2; *see also* Ana Dep. Tr. at 48:16-23 ("There was an officer who kept saying – the cop that did all the arresting said, You seen him lunge at me. You seen him lunge at me. . . . I said, he didn't lunge at anybody. He's very calm. He didn't lunge at anybody."). The officers held down plaintiff and ordered him to put his hands behind his back. Patrizio said, "I couldn't because they were all over my arms. If you're holding my arms, how am I going to put my arms behind my back?" Patrizio Dep. Tr. at 54:4-17.

Defendants contend that after Adam opened the door and they entered the hallway (D), they began to interview Adam, but were repeatedly interrupted by Patrizio screaming at Adam and the officers. Nelson Dep. Tr. at 70:7-22, 72:24-74:15; DeMichael Dep. Tr. at 42:16-43:7, 69:22-70:4, 74:24-75:7. Plaintiff allegedly yelled to Adam, "Why you let the cops in the house? Why you let this nigger in my home?" Nelson Dep. Tr. at 74:2-5.

During this interaction, the officers contend they determined that Patrizio was not involved in the assault and asked him to go to his apartment and stop disrupting their investigation. *Id.* at 70:7-22, 79:18-80:20. According to Nelson, he and DeMichael went up a few steps but never made it to the second-floor apartment because Patrizio was yelling disruptively from the hallway (D). *See* Hr'g Tr., June 9, 2016. Nelson states that he asked Patrizio to go back to his apartment at least three times. *Id.*

Defendants testified that they ultimately placed Patrizio under arrest in the hallway (D) to prevent interference with their carrying out their investigative duties. Nelson Dep. Tr. at 80:24-81:18, 87:9-88:13; DeMichael Dep. Tr. at 69:22-70:4, 75:3-9.

As they were placing him under arrest, the officers claim that plaintiff flailed his arms, preventing handcuffing. Nelson Dep. Tr. at 81:12-82:15; DeMichael Dep. Tr. at 47:4-16; Adam Dep. Tr. at 90:4-13; Glickman Decl., Ex. E ("Oggeri Dep. Tr."), ECF No. 57-5, at 29:12-21. Patrizio also allegedly grabbed Nelson's jacket, lunged at him, and attempted to hit the officer with his fist. Nelson Dep. Tr. at 81:12-82:16; DeMichael Dep. Tr. at 45:5-46:15; Johnson Decl., Ex. D ("Cilento Dep. Tr."), ECF No. 68-4, at 21:25-23:17; *see also* DA Screening Sheet ("[Patrizio] swung at [Nelson's] face missing [Nelson's] face and [Nelson] took [Patrizio] down to the ground . . . ."). The officers state that they subdued plaintiff by forcing his hands behind his back. Nelson Dep. Tr. at 88:25-90:17; DeMichael Dep. Tr. at 47:14-49:6. As they were

doing this, "[three officers] tripped into the kitchen. . . . [and] fell on the floor" with plaintiff. Nelson Dep. Tr. at 90:19-91:2, 91:13-92:5; *but see* Oggeri Dep. Tr. 27:24-29:8 ("Q. How did you end up inside the apartment if he was standing in the doorway when this transpired?  A. We walked in.  Q. You walked into his apartment?  A. After he swung at Officer Nelson.  Q. Why did you walk into his apartment?  A. Because he tried to assault a police officer.").

Defendants contend that Chien should be dismissed from this action on qualified immunity grounds since he arrived after the arrest.  Def.s' Mem., ECF No. 66, at 23-24.  Plaintiff states that in approving his arrest, Chien is also liable.  Pl.'s Reply at 10.

## III.   Law

### A.   Summary Judgment

Summary judgment is properly granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if, viewing the evidence "in the light most favorable to the party opposing the motion," "a reasonable jury could return a verdict for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  The non-moving party must demonstrate a genuine dispute with more than "conclusory allegations, speculation or conjecture."  *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  If the non-movant fails to come forward with such evidence, summary judgment is granted.  *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 135 (E.D.N.Y. 2013).

Courts do not weigh evidence or assess credibility when deciding a summary judgment motion. *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d. Cir. 1996). Such determinations are "the sole province of the jury." *Id.*

## B.    Section 1983

Plaintiff asserts claims pursuant to section 1983 of Title 42. This law provides a mechanism for an individual to seek damages for the deprivation of constitutional rights by state actors. *See Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985))). The provision states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

To maintain an action pursuant to section 1983, a plaintiff's allegations must satisfy two elements. First, "[t]he conduct at issue must have been committed by a person acting under color of state law." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (internal quotation marks and citation omitted). Second, the conduct "must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* (internal quotation marks and citation omitted).

There is no dispute that defendants were acting under color of state law as members of the New York Police Department.

## C.     Unlawful Entry

The first issue in both plaintiff's and defendants' motions for summary judgment is the officers' alleged unlawful entry into the common hallway (D) of the building.

Warrantless entry of state actors into one's home is protected by the Fourth Amendment of the Constitution.  It states:

> The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Am. IV.

### 1.     Reasonable Expectation of Privacy

In order to have a viable Fourth Amendment claim, a person must have a "reasonable expectation of privacy" when subjected to a warrantless government intrusion.

Prior to the Supreme Court's decision in *Katz v. United States*, 389 U.S. 347 (1967), courts typically used the concept of a "constitutionally protected area" to define the bounds of the Fourth Amendment.  *United States v. Titemore*, 437 F.3d 251, 256 (2d Cir. 2006) (internal citation omitted).  In *Katz*, the Supreme Court held that a person's conversations on a public phone were protected because "the Fourth Amendment protects people, not places."  389 U.S. at 351.  Justice Harlan's concurrence in the case provided the basis for future Fourth Amendment jurisprudence based on "expectation of privacy":

> As the Court's opinion states, "the Fourth Amendment protects people, not places."  The question, however, is what protection it affords those people.  Generally, as here, the answer to that question requires reference to a "place."  My understanding of the rule that has emerged from prior decisions is that *there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."*  Thus a man's home is, for most purposes a place where he expects privacy, but

> objects, activities, or statements that he exposes to the "plain view"
> of outsiders are not "protected" because no intention to keep them
> to himself has been exhibited.  On the other hand, conversations in
> the open would not be protected against being overheard, for the
> expectation of privacy under the circumstances would be
> unreasonable.

*Id.* at 361 (Harlan, J., concurring) (emphasis added).  *See Smith v. Maryland*, 442 U.S. 735, 740-41 (1979) (adopting Justice Harlan's "reasonable expectation of privacy" test).

### i.    Common Area

A resident of a multiple-apartment building does not have a reasonable expectation of privacy in the common areas of his building, even if those areas are locked to exclude the public. *See, e.g.*, *United States v. Holland*, 755 F.2d 253 (2d Cir. 1985) (arrest in common hallway of two-story apartment building did not take place in defendant's zone of privacy); *id.* at 255 ("Although the Supreme Court has accorded apartments and hotel rooms status as 'homes' for Fourth Amendment purposes, it has never given the same status to adjoining common hallways."); *see also United States v. Gray*, 283 F. App'x 871, 873 (2d Cir. 2008) ("Gray did not have a privacy interest in the hallway because it was not subject to his exclusive control.  The record indicates that Gray and his neighbor shared the hallway and both stored items in the common area. . . . Because Gray did not have a legitimate expectation of privacy in the hallway, the officers' hallway entry did not violate Gray's Fourth Amendment right."); *United States v. Shaw*, 269 F. Supp. 2d 90, 91 (2d Cir. 2003) ("It is well-settled that individual tenants in multifamily dwellings have no legitimate privacy expectation in common areas, even when guarded by locked doors." (internal quotation marks and citations omitted)).

With regard to buildings occupied by a single family, however, courts have recognized Fourth Amendment protections over common areas.  *Cf. United States v. Sykes*, 304 F. App'x 10, 12 n.1 (2d Cir. 2008) ("The factual determination of whether a vehicle is included within the

scope of particular premise' curtilage may vary depending on, *inter alia*, whether the premises host a single-family or a multi-family dwelling." (citations omitted)). *See also United States v. Werra*, 638 F.3d 326, 332 (1st Cir. 2011) ("If they lived separately – like apartment dwellers – they could not claim the common areas of the house, including the foyer, as their private space vis-à-vis outsiders.  However, if they did not live in individualized "residences" within the house – and were thus more like the occupants of a single-family home – their right to privacy vis-à-vis outsiders would begin at . . . [the] front door.  Under the latter scenario, the officers would have violated Werra's reasonable expectation of privacy."); *United States v. Dillard*, 438 F.3d 675, 684 (6th Cir. 2006) ("Because a duplex is more akin to a single-family home than a large apartment building, we held that King had a reasonable expectation of privacy in the basement [open to residents of both apartments]." (citing *United States v. King*, 227 F.3d 732 (6th Cir. 2000) where defendants, who were brothers, lived in one unit and their mother and siblings lived in the other)).

### ii.    Kitchen

The complaint raises a claim for unlawful entry only with respect to defendants' entrance into the common hallway, not plaintiff's kitchen.  Considering that "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion," the court deems the complaint amended to include the alleged unconstitutional entry into the kitchen.  *Payton v. New York*, 445 U.S. 573, 590 (1980) (internal quotation marks, alterations, and citation removed); *see* Hr'g Tr., June 9, 2016.

Warrantless entry into one's home is per se unreasonable unless it satisfies an established exception.  *Pearson v. Callahan*, 555 U.S. 223, 230 (2009) (internal citation omitted).  Two such exceptions are exigent circumstances and consent.  *Id.*

14

## 2.    Exigent Circumstances

The primary inquiry in determining whether exigent circumstances justified a warrantless entry is "whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (citing *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970)). The determination is fact-specific and turns on the "totality of the circumstances confronting law enforcement agents in the particular case." *Id.* Courts consider "the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney v. Davidson*, 133 F.3d 189, 196-97 (2d Cir. 1998).

The Court of Appeals for the Second Circuit has adopted six factors, identified in *Dorman*, to support this determination. It has "consistently emphasized that the *Dorman* factors are intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account. Sometimes a solitary factor suffices, alternatively, a combination of several" may be necessary. *MacDonald*, 916 F.2d at 770 (citations omitted). The factors are summarized as follows:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir. 1978) (quoting *Dorman*, 435 F.2d at 392-93).

With regard to family violence in particular, the Court of Appeals for the Second Circuit has recognized "the combustible nature of domestic disputes, and ha[s] accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." *Tierney*,

133 F.3d at 197. The court has found there to be exigent circumstances during family assaults where officers believed the suspect was still on the premises – even if they did not hear any sounds upon arrival. *See Hogan v. Buttofocco*, 379 F. App'x 35, 36 (2d Cir. 2010) (entry into apartment justified where officers saw from outside of the door house in disarray, victims looking distraught, and plaintiff sweating profusely); *Tierney*, 133 F.3d at 192 (exigent circumstances present where "silence suggested to [officer] that someone in the house might be injured, and the fact that the dispute had just ended suggested . . . that both parties to the fight were still present.").

Other courts have concluded that "domestic violence situations are not *per se* exigent," *United States v. Sikut*, 488 F. Supp. 2d 291, 307 (W.D.N.Y. 2007) (citing *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006)), and that "there is no domestic abuse exception to the Fourth Amendment, generally." *Id.* (citing *United States v. Black*, 466 F.3d 1143, 147 (9th Cir. 2006)).

### 3.    Consent

An exception to the warrant requirement is lawfully obtained consent. The Fourth Amendment "does not apply . . . to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted). "Common authority" means the "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

Consent from an occupant or co-occupant may not be coerced by law enforcement officers. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222-23 (1973). A "knowing and intelligent" waiver, however, is not required. In *United States v. Garcia*, 56 F.3d 418 (2d Cir.

1995), the Court of Appeals for the Second Circuit explained that consent is determined by looking to the "totality of the circumstances":

> To ascertain whether consent is valid, *courts examine the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice*, rather than a mere acquiescence in a show of authority. It is also well established that the concept of [a] knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context. . . . *So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search.*

*Id.* at 422 (internal quotation marks and citations omitted; emphasis added).

In a case where a co-occupant gave her voluntary consent to the government's entry, the Supreme Court determined that fruits of the search were improperly suppressed. *See Matlock*, 415 U.S. at 992. The court distinguished that holding in *Georgia v. Randolph*, where it held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." 547 U.S. 103, 106 (2006).

The *Randolph* court noted, however, that while an occupant's express refusal to permit entry negates consent offered by a co-occupant, it does not negate exigent circumstances to assist a suspected domestic violence victim:

> But this case has no bearing on the capacity of the police to protect domestic victims. The dissent's argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence. No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent

17

probable cause, *see Texas v. Brown*, 460 U.S. 730, 737-739, (1983) (plurality opinion).)  Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.  *See* 4 LaFave § 8.3(d), at 161 ("[E]ven when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other. . . . [W]here the defendant has victimized the third-party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections" (internal quotation marks omitted; third omission in original)).  The *undoubted right of the police to enter in order to protect a victim*, however, *has nothing to do with the question* in this case, *whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.*

*Randolph*, 547 U.S. at 118-19 (emphasis added)

In sum, even though disputed consent may require the suppression of evidence, where there are exigent circumstances present, a resident's non-consent does not render warrantless entry unlawful.

### D.      False Arrest

To prove a false arrest claim under section 1983 and pursuant to the Fourth Amendment, a plaintiff must show that the arrest was without probable cause.  *See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Singer v. Fulton County Sherriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Weyant*, 101 F.3d at 852 (citations omitted). Whether probable cause existed at the time of an arrest "may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute."  *Id.* (internal citations omitted).

Defendants arrested Patrizio for committing the New York State crimes of Obstructing Governmental Administration and Disorderly Conduct.  Significantly, the Court of Appeals for the Second Circuit has concluded that "it is not relevant whether probable cause existed with respect to each individual charge, or indeed, any charge actually invoked by the arresting officer at the time of arrest.  Stated differently, when faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  This means that so long as the defendants had probable cause to arrest Patrizio for *any crime*, there was no false arrest.

### 1.    Obstructing Governmental Administration

Section 195.05 of the New York Penal Law ("N.Y.P.L.") makes Obstructing Governmental Administration a crime.  The provision includes attempts to prevent an official from performing his duties.  It reads:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or *attempts to prevent a public servant from performing an official function*, by means of intimidation, physical force or interference, or by means of any independently unlawful act, or by means of interfering, whether or not physical force is involved, with radio, telephone, television or other telecommunications systems owned or operated by the state, or a county, city, town, village, fire district or emergency medical service or by means of releasing a dangerous animal under circumstances evincing the actor's intent that the animal obstruct governmental administration.

N.Y.P.L. § 195.05 (emphasis added).

Obstructing Governmental Administration is a class A misdemeanor punishable by no more than one year in prison. *Id.*; N.Y.P.L. § 70.15.  The crime encompasses refusal to open the door to one's home for police where there is probable cause to arrest, *Johnson v. City of New York*, No. 05-CV-7519, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008); speaking during

19

the course of a police action or disregarding police instructions, *Cancel v. Kelly*, No. 13-CV-6007, 2016 WL 590230, at \*4 (S.D.N.Y. Feb. 11, 2016); and pulling up one's arm as if to strike an officer, *People v. Tarver*, 591 N.Y.S.2d 907, 907 (3d Dep't 1992).

### 2. Disorderly Conduct

Disorderly Conduct is a violation of section 240.20 of the New York Penal Law.  The relevant law covers a wide variety of malicious conduct interfering with public peace.  It states:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
>
> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
> 4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
> 5. He obstructs vehicular or pedestrian traffic; or
> 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
> 7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y.P.L. § 240.20.

Disorderly conduct is categorized as a "violation."  *Id.*  In *People v. Gilbert*, the Appellate Division stated, "In law, felonies and misdemeanors are crimes, while disorderly conduct is classified as an offense, as to which the City Magistrate has plenary jurisdiction."  12 N.Y.S.2d 632, 635 (1st Dep't 1939).  The offense is punishable by no more than 15 days in jail.  N.Y.P.L. § 70.15(4).

### E. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (internal quotation marks and citations omitted). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* A government official enjoys qualified immunity regardless of whether her error is a mistake of law, mistake of fact, or a mistake of both law and facts. *Id.* (citation omitted).

The Supreme Court has stated that "qualified immunity is an immunity from suit rather than a mere defense to liability." *Id.* (internal quotation marks and citation omitted). As a result, courts should resolve insubstantial claims against government officials "prior to discovery." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)).

## III.    Application of Law to Facts

Defendants' motion for summary judgment on the claim of unlawful entry to the common hallway (D) is granted. Viewing the facts in the light most favorable to Patrizio, exigent circumstances justified the officers' warrantless entry into the hallway.

Plaintiff has a triable claim with respect to the officers' entry into his kitchen.

There are numerous issues of material fact a jury will need to resolve with respect to the false arrest claim. As a result, both parties' motions are denied regarding the alleged false arrest.

Sergeant Chien is dismissed from this action on qualified immunity grounds. Officer Morin is dismissed on consent.

### A.    Unlawful Entry

The first step of the unlawful entry analysis is to determine whether plaintiff had a reasonable expectation of privacy in the common hallway. Viewing the facts in the light most favorable to plaintiff, it appears that Patrizio did have such an expectation. There is no dispute

that the building has two apartments, both of which are occupied by the same extended family. There is also no dispute that the inner door (C) is locked to outsiders. These facts point to the conclusion that each of the single-family tenants of the building had "exclusive control" over the common hallway, which was within Patrizio's "zone of privacy." *See Gray*, 283 F. App'x at 873. Warrantless entry into the hallway would be proper only if exigent circumstances were present, or in the absence of such circumstances, if proper consent was given by a resident of the building.

Viewing the facts in the light most favorable to plaintiff, the court finds that there were emergency circumstances present to lead the officers to believe entry through the inner door (C) was necessary. The victim apparently called the police. The 911 dispatcher stated that there was a family assault *in progress* and that there may or may not be weapons involved. The officers used their emergency lights and drove through at least one stop sign to arrive as soon as possible. Upon arrival, the officers did not know whether Patrizio was the assailant. His refusal to open the door arguably could lead a reasonable officer to feel suspicious. Contrary to plaintiff's assertion that because the officers did not hear any suspicious sounds, they should not have deemed the situation an emergency, courts have held that even without noises, there may be exigent circumstances – especially in domestic violence cases. *See, e.g.*, *Hogan*, 379 F. App'x at 36; *Tierney*, 133 F.3d at 192. It is not in the public interest for officers to delay investigating domestic violence reports for fear of civil liability when a resident refuses to open the door. Considering the totality of the circumstances, the entry to the common hallway (D) satisfies the exigency exception to the warrant requirement.

Because the warrantless entry falls under the exigent circumstances exception, the court need not reach the question of whether the entry to the common hallway was consented.

To the extent that plaintiff's unlawful entry claim is amended to include the entry of defendants into his kitchen through his apartment door, it survives. Patrizio may well have had a reasonable expectation of privacy in his home, and there is no dispute that no one consented to allowing the officers to enter any part of the first-floor apartment. By the time defendants are alleged to have entered Patrizio's kitchen, they were probably aware that he was not the assailant. Whether entry to the kitchen was merely incidental to the arrest is for the jury to decide. Qualified immunity may not shield defendants from damages for unlawful entry into one's home, which is in clear violation of the Fourth Amendment.

Defendants' motion for summary judgment on the unlawful entry to the common hallway is granted because exigent circumstances were present; plaintiff's motion on this claim is denied. The complaint is amended to include a claim for the warrantless entry into Patrizio's kitchen. That claim will be tried by the jury.

**B.      False Arrest**

There are innumerable disputed facts with respect to Patrizio's false arrest claim. A jury must resolve those factual disputes to determine whether defendants had probable cause to arrest plaintiff.

Plaintiff claims that the officers arrested him for refusing to open the door (C) to the hallway, which by itself is not a crime.

The officers, by contrast, contend that Patrizio was "combative" from the moment they approached the inner door. They testified that plaintiff used racial slurs against Officer Nelson and lunged at him as if to strike him. Patrizio allegedly yelled and screamed during the officers' interview of Adam. Defendants state that this behavior constituted probable cause for Obstructing Governmental Administration and Disorderly Conduct.

Plaintiff contends that defendants' claims about him lunging at Nelson and interfering with Adam's interview only arose after he filed a complaint in this case. He argues that these facts are not objectively supported by any of the documentation related to his arrest.

The only undisputed fact is that plaintiff refused to open the inner door (C) for defendants. While defendants point to cases where such conduct provided probable cause to arrest, such conduct is not by itself unlawful. *See, e.g.*, *Johnson*, 2008 WL 4450270, at *1 (officers arrived to find injured woman "hysterical and crying" outside of apartment; upon arrival, she told the officers plaintiff had physically forced her out and she wanted to be let back in; plaintiff refused to open door and was arrested once officers forced open door). Defendant's motion on the false arrest claim is denied.

Plaintiff's claim is also denied because, while refusal to open a door is not by itself a reason to arrest, it is disputed whether plaintiff did more in frustrating a serious police investigation to warrant his arrest.

With respect to qualified immunity, the officers contend that they did not violate clearly established law of which a reasonable person would have known when they arrested plaintiff for his refusal to open the inner door. *See Pearson*, 555 U.S. at 231. The jury must resolve cloudy and disputed factual issues before it can be determined whether defendants are eligible for qualified immunity.

With regard to defendant Chien, dismissal on qualified immunity grounds is warranted. It is undisputed that he arrived on the scene *after* both the officers' entry into the building and Patrizio's arrest. Upon arrival, the officers told him that plaintiff had blocked Nelson and DeMichael's entrance into the apartment building, and on the basis of what Chien understood to be true, he determined that the arrest was properly based on probable cause. Viewing those facts

in the light most favorable to plaintiff, Chien did not violate clearly established law of which a reasonable person would have known. His determination of probable cause was reasonable considering the information that was available to him. Contrary to Patrizio's assertion, mere approval of an allegedly false arrest is not per se unlawful. Chien also followed proper protocol by calling an ambulance to offer Patrizio the medical attention he says he required.

## IV.    Conclusion

Plaintiff's summary judgment motion with respect to his unlawful entry and false arrest claims is denied. Defendants' motion for summary judgment on the false arrest claim is denied. Defendants' motion for summary judgment on the unlawful entry claim is granted, but only with respect to the officers' entry into the common hallway (D). The complaint is deemed amended to include a claim for false entry into plaintiff's kitchen; the claim is considered denied by defendants and may go forward. Defendant Chien is dismissed on the basis of qualified immunity. Officer Morin is dismissed on consent.

Jury selection will be by the magistrate judge on July 11, 2016. Motions in limine will be heard at 11:30 AM on July 20, 2016. Trial will begin at 12:30 PM on the same day.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: June 27, 2016
Brooklyn, New York